# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**HEIDE NOONAN,**

    **Plaintiff,**

    v.                                        Case No. 18-CV-641

**ANDREW M. SAUL,**
**Commissioner of Social Security,**

    **Defendant.**

## DECISION AND ORDER

    Heide Noonan seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for a period of disability and disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision is affirmed.

## BACKGROUND

    Noonan filed an application for a period of disability and disability insurance benefits alleging disability beginning on September 11, 2013 due to lupus, diabetes, diabetic neuropathy, rheumatoid arthritis, hypothyroidism, cholesterol, depression, hiatal hernia, cataracts, and TMD. (Tr. 65–66.) Noonan's applications were denied initially and upon reconsideration. (Tr. 15.) Noonan filed a request for a hearing and a hearing was held before an Administrative Law Judge ("ALJ") on January 24, 2017. (Tr. 30–58.) Noonan testified at the hearing, as did Shannon Hollander, a vocational expert. (Tr. 30.)

    In a written decision issued February 17, 2017, the ALJ found that Noonan had the following severe impairments: degenerative disc disease, lumbar radiculopathy, lupus,

osteoarthritis, depression, diabetes mellitus, hypertension, and bilateral carpal tunnel syndrome. (Tr. 17.) The ALJ further found that Noonan did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). (Tr. 18.) The ALJ found that Noonan had the residual functional capacity ("RFC") to perform sedentary work, with the following limitations: never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; frequently finger bilaterally with the upper extremities; and limited to simple, routine tasks involving simple, work-related decisions in an environment free of fast-paced productivity requirements and with few workplace changes. (Tr. 19.)

While the ALJ found that Noonan was unable to perform any of her past relevant work (Tr. 22), the ALJ determined that given Noonan's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that she could perform. (Tr. 23.) As such, the ALJ found that Noonan was not disabled from her alleged onset date until the date of the decision. (Tr. 24.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied the plaintiff's request for review. (Tr. 1–5.)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence,

remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### 2. *Application to this Case*

Noonan argues the ALJ erred by: (1) failing to consider whether she met Listing 11.14; (2) creating an evidentiary gap after rejecting the opinions of the state agency physicians; and (3) improperly discounting Noonan's subjective symptoms. I will address each argument in turn.

#### 2.1 Consideration of Listing 11.14

Noonan argues the ALJ erred by failing to consider whether she met Listing 11.14– Peripheral Neuropathy. The plaintiff has the burden of showing that her impairments meet or medically equal a listing. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). To establish that an impairment or combination of impairments meet or are equivalent to a listed impairment, a plaintiff must present medical findings that meet or are equal in severity to all of the criteria in a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530–31 (1990) (citing SSR 83–19

and 20 C.F.R. § 416.926(a)). The Seventh Circuit has stated that an ALJ's "failure to discuss or even cite a listing, combined with an otherwise perfunctory analysis, may require a remand." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (internal citation omitted). However, the court has also found that "the ALJ may rely solely on opinions given in Disability Determination and Transmittal forms and provide little additional explanation . . . . [if] there is no contradictory evidence in the record." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006). Furthermore, "[a]lthough an ALJ should provide a [listings] analysis, a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing." *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (internal citations omitted).

The ALJ analyzed whether Noonan's back condition met Listing 1.04, whether her lupus met Listing 14.02, whether her carpal tunnel syndrome met Listing 1.02, and whether her mental impairments met Listing 12.04. (Tr. 18–19.) The ALJ did not, however, analyze whether the medical evidence met or medically equaled Listing 11.14–Peripheral Neuropathy. To meet Listing 11.14, the claimant must show either A or B:

- A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities.

OR

- B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following:

  1. Understanding, remembering, or applying information (see 11.00G3b(i)); or
  2. Interacting with others (see 11.00G3b(ii)); or
  3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
  4. Adapting or managing oneself (see 11.00G3b(iv)).

4

Noonan does not attempt to show that she meets or medically equals part B of Listing 11.14; rather, she argues that she has presented evidence that she meets or medically equals part A of Listing 11.14. (Pl.'s Reply Br. at 1–4, Docket # 25.) But the evidence Noonan presents falls quite short of showing that she meets or medically equals part A of Listing 11.14. Again, to meet part A of Listing 11.14, Noonan must show disorganization of motor function in two extremities that results in an "extreme limitation" in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities. As to the standing limitation, the listing further defines an "extreme limitation" as "the inability to stand up from a seated position" and defines the "inability to stand up from a seated position" as follows: "Inability to stand up from a seated position means that once seated you are unable to stand and maintain an upright position without the assistance of another person or the use of an assistive device, such as a walker, two crutches, or two canes." Listing 11.00D(2)(a).

Noonan points to a record from her neurologist, Dr. Jorge Marquez de Leon, from September 2013 where he noted that Noonan's gait appeared abnormal and was antalgic and that it was "[h]ard to stand up without using hands." (Tr. 553–54.) The record does indicate that Noonan had difficulty getting up from a chair without using her hands and arms (Tr. 553–55) and at one point the record stated that Noonan could not get up from a chair without using her arms (Tr. 675). The record also shows that she used a walker for ambulation for a period. (Tr. 586, 782–83.) However, this falls short of showing she meets or medically equals part A of Listing 11.14. While the records indicate Noonan had some difficulties getting up once seated, this is insufficient. Noonan must show not only that she was unable to stand without another person or an assistive device, but that she could not maintain an upright position without assistance.

5

Noonan further argues that the records show she lost her balance when ambulating. (Pl.'s Br. at 11.) Listing 11.00D(2)(b) defines an "extreme limitation" in the ability to balance as follows: "Inability to maintain balance in a standing position means that you are unable to maintain an upright position while standing or walking without the assistance of another person or an assistive device, such as a walker, two crutches, or two canes." Again, while the record clearly indicates Noonan was having some balance issues and suffered from falls on occasion (Tr. 720, 783), the records do not indicate that she was unable to stay upright without the help of an assistive device or another person.

Finally, Noonan points to evidence that she suffers from carpal tunnel syndrome and had pain and other neurological abnormalities in her upper extremities. (Pl.'s Reply Br. at 4.) Once again, however, the listing requires Noonan to show an "extreme limitation" in her ability to use her upper extremities, and that is defined as "a loss of function of both upper extremities" that "very seriously limits your ability to independently initiate, sustain, and complete work-related activities involving fine and gross motor movements." Listing 11.00D(2)(c). While Noonan again cites evidence showing pain, some loss of sensation, and some loss of reflexes in the upper extremities (Tr. 622, 675, 786), this evidence falls significantly short of showing a loss of function. In fact, many of the records show full range of motion and no pain in Noonan's shoulders, elbows, wrists, and fingers, despite having a positive Tinel's sign in both wrists. (Tr. 675, 724, 786, 1284.)

Further, both State Agency physicians considered Listing 11.14 and found she did not meet it. (Tr. 64, 70, 74, 82.) Noonan presents no contrary evidence from any of her treating physicians indicating that she does, in fact, meet Listing 11.14. Thus, although the ALJ did not specifically consider Listing 11.14, Noonan has not met her initial burden of presenting

medical findings that meet or equal in severity all the criteria specified by the listing. Thus, remand is not required to address Listing 11.14.

### 2.2 RFC Assessment–Evidentiary Gap

Noonan argues that the ALJ erred in the assessment of her RFC by creating an evidentiary gap in the record when she rejected the opinions of the two State Agency physicians. Specifically, Noonan argues that the ALJ needed to obtain an additional medical opinion to determine what limitations her mental and physical impairments required. (Pl.'s Br. at 11–13.) As to her physical impairments, Noonan asserts that the ALJ failed to build an accurate and logical bridge explaining how the evidence supported a sedentary RFC with frequent use of the hands. (*Id.* at 13.) I disagree. As to the fingering limitation, the ALJ stated that because Noonan had an EMG test showing motor polyneuropathy findings consistent with carpal tunnel syndrome, she was including the fingering limitation. (Tr. 22.) Both State Agency physicians opined a frequent bilateral fingering limitation (Tr. 68, 84) and the ALJ stated that she was adopting that limitation (Tr. 22).

Noonan also argues that the ALJ failed to account for her migraines, floaters, and diabetic retinopathy in the RFC. (Pl.'s Br. at 13, Pl.'s Reply Br. at 6.) While the record indicates Noonan suffered from "mild background diabetic retinopathy" (Tr. 1300) and noted that her vision has "gradually decreased," (Tr. 1278), beyond wearing glasses, Noonan does not indicate how her vision issues affect her ability to work (Tr. 47). Noonan also points to a single record indicating that she gets migraines twice a month (Tr. 1278) and argues that because the VE testified that missing two days of work per month is work preclusive (Tr. 55) the ALJ erred in considering her migraines. But there is no evidence in the record that Noonan's migraines would cause her to miss two days per month of work. Noonan never

7

alleged any limitations due to migraines and did not seek treatment for migraines. Thus, Noonan fails to indicate what specific physical limitations the ALJ failed to account for in the RFC.

Noonan also takes issue with the limitation to sedentary work because she argues that the record does not show that she can sit for six hours per day and the ALJ fails to point to any evidence supporting the limitation. (Pl.'s Br. at 12.) Both State Agency physicians opined Noonan could perform light work. (Tr. 68, 84.) The ALJ gave "some weight" to these opinions, explaining that "the consistent deficits in areas such as gait suggest an exertional limitation more consistent with sedentary and the above postural limitations." (Tr. 22.) Both State Agency physicians opined Noonan could sit for six hours in an eight-hour workday and stand and/or walk for six hours in an eight-hour workday. (Tr. 71, 83.) The main difference between sedentary and light work is the ability to walk or stand. SSR 83-10. Sedentary jobs are generally performed sitting down (generally a total of six hours in an eight-hour workday), while light jobs require standing or walking for a total of approximately six hours of an eight-hour workday. *Id.* As the ALJ explained, she was rejecting the State Agency physicians' opinions regarding her ability to perform light work because of Noonan's gait deficits. (Tr. 22.) This suggests the ALJ disagreed with the opinions regarding Noonan's ability to walk and/or stand for six hours in an eight-hour workday. Rather, as the ALJ explained, her limitations are consistent with sedentary work, which requires sitting. Contrary to Noonan's assertion, the ALJ did not completely reject the State Agency physicians' opinions. (Pl.'s Br. at 11.) Rather, the ALJ stated she was giving the opinions "some weight" and explained which portion of the opinions she disagreed with. The ALJ clearly agreed, however, with their opinions that Noonan could sit for six hours out of an eight-hour workday. Thus, the

evidence supports a limitation to sedentary work. For these reasons, Noonan has not shown the ALJ erred in assessing her physical RFC.

Regarding her mental limitations, Noonan argues that the ALJ created an evidentiary gap by rejecting the opinions of the State Agency physicians that her depression was not a severe impairment. Noonan argues that the SSA's regulations provide that medical expertise is required to assess the severity of a mental impairment using the Special Technique form and because the Agency did not find her mental impairments severe, no doctor completed a Psychiatric Review Technique Form. (Pl.'s Reply Br. at 5.) Noonan cites *Otto v. Berryhill*, No. 17-C-0943, 2018 WL 4676155 (E.D. Wis. Sept. 28, 2018) in support. (*Id.*)

In *Otto*, the plaintiff had not alleged a mental impairment in his initial applications; thus, the Agency never evaluated the severity of the mental impairment using the Special Technique form. The court found that the SSA's regulations provide that medical expertise is required to assess the severity of a mental impairment using the Special Technique and the ALJ erred by providing his own assessment of the severity of the mental impairment without any medical evidence in the record. *Id.* at *5.

But that is not what happened here. Noonan alleged her depression was a disabling condition (Tr. 65) and both State Agency consultants agreed that her depression was a medically determinable impairment (Tr. 69, 81). The State Agency consultants then used the Special Technique form to evaluate the severity of Noonan's mental impairments, consistent with 20 C.F.R. § 404.1520a(d). (Tr. 69–70, 81–82.) However, because the consultants found her degree of limitation in the four broad functional areas to be "none" or "mild," they both found Noonan's mental impairments not severe, consistent with 20 C.F.R. § 404.1520a(d)(1). (*Id.*) As such, the State Agency consultants did not evaluate whether Noonan met a listing or

9

her mental RFC. 20 C.F.R. § 404.1520a(d)(2), (3). Thus, contrary to Noonan's assertion, the doctors did complete a Special Technique form, they just did not continue in the process by evaluating whether she met a listing or her mental RFC because they found her impairment non-severe.

The ALJ rejected the portion of the State Agency consultants' opinions finding Noonan's depression non-severe, stating that this finding was not supported by the record because the evidence showed Noonan had mood problems despite treatment, warranting vocational limitations. (Tr. 22.) The ALJ then explained that because Noonan stated she had problems with memory and concentration, she was limiting her to simple, routine tasks involving simple, work-related decisions in an environment free of fast-paced productivity requirements with few workplace changes. (Tr. 19, 22.)

What Noonan truly argues, then, is that the ALJ erred in completing the RFC assessment without a medical opinion. But Noonan acknowledges that the ALJ is responsible for assessing the RFC. (Pl.'s Reply Br. at 6.) And while she is correct that the RFC assessment must have an evidentiary basis, the evidentiary basis is not, as Noonan suggests, lacking in this case. (*Id.*) As cited above, the ALJ explained that she was basing Noonan's limitations on Noonan's own statements and the treatment she received. (Tr. 22.) As with her physical limitations, Noonan fails to explain how the mental restrictions in her RFC fail to account for her limitations. For these reasons, the ALJ did not create an evidentiary gap that she impermissibly filled with her own lay opinion. The ALJ did not err in assessing Noonan's RFC.

### 2.3 Consideration of Subjective Complaints

Finally, Noonan argues that the ALJ erred in not fully crediting her subjective complaints. The Commissioner's regulations set forth a two-step test for evaluating the credibility of a claimant's statements regarding her symptoms. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, used for relief of the symptoms; other measures the claimant uses to relieve the symptoms; and any other factors concerning the claimant's functional limitations due to the symptoms. *Id.* While an ALJ "may discount subjective complaints of pain that are inconsistent with the evidence as a whole . . . the ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995). The lack of objective medical evidence is merely one factor to consider, along with the other factors listed in SSR 16-3p. *Id.*

In assessing Noonan's RFC, the ALJ found that Noonan's statements regarding her physical and mental limitations were not entirely consistent with the medical evidence and

the other evidence in the record. (Tr. 20.) While the ALJ goes into detail of the deficits Noonan's impairments caused and the treatment she received, the ALJ's evaluation boils down to the fact that Noonan's conditions were managed conservatively and she responded well to treatment. (Tr. 20–22.) Noonan argues a host of issues with how the ALJ evaluated her symptoms, including: the ALJ improperly found Noonan's treatment "conservative," improperly relied on the medical records finding her lupus "stable," failed to consider the neuropathy in her hands, failed to properly consider that pain alone can be disabling, failed to properly consider her mental health symptoms, and generally failed to address the factors of SSR 16-3p. (Pl.'s Br. at 13–21.)

Noonan's arguments are without merit. Noonan first takes issues with the ALJ finding her treatment was conservative, arguing that she underwent the proper treatment for managing her conditions. (*Id.* at 14.) Noonan argues, for example, that neuropathy is managed with pain medications and her lupus was managed with Plaquenil (until she needed to stop the medication because she developed ocular toxicity). (*Id.* at 14–16.) Her mental health issues were managed through therapy and antidepressants. (Tr. 772, 866–880, 1165–1229.)

Regarding her neuropathy treatment, perhaps the ALJ's use of the word "conservative" is not entirely accurate. She was not, for example, simply managing her pain with over-the-counter medications—a decidedly "conservative" treatment method. Rather, she was prescribed 600 mg of gabapentin for her nerve pain. (Tr. 1380.) But even if one does not wish to call use of prescription medication "conservative" treatment, the ALJ did not err. The ALJ correctly recounted the treatment Noonan underwent for her conditions and then focused on how Noonan responded to the treatments. And Noonan did show improvement

12

in her neuropathy symptoms on gabapentin. (Tr. 586, 829, 1017, 1281.) She similarly showed improvement in her mental health symptoms on antidepressants. (Tr. 1188, 1202.) Noonan has not shown how the ALJ erred in this regard.

Regarding the ALJ's reliance on the fact Noonan's lupus was "stable," Noonan argues that one can be stable and disabled because stable just means unchanged, it does not address the level of her condition. (Pl.'s Br. at 16–17.) Noonan is correct regarding the meaning of "stable." However, the ALJ did not equate "stable" with having no symptoms. Rather, the ALJ considered Noonan's lupus symptoms, including problems with gait, balance, and arthralgia. (Tr. 21.) The ALJ specifically found that Noonan "had deficits," but that she was capable of sedentary work with restrictions despite these deficits. While Noonan asserts that she had to discontinue her lupus medication in August 2016 because she developed ocular toxicity (Tr. 1302) and had to begin other medications for pain management in November 2016 instead (Tr. 47, 1385–86), she fails to explain how the ALJ improperly credited her subjective complaints regarding lupus.

Noonan further argues the ALJ failed to consider that she had neuropathy in her hands. (Pl.'s Br. at 17.) On the contrary, the ALJ specifically considered the EMG showing motor polyneuropathy consistent with carpel tunnel syndrome and explains that is why she included a fingering limitation. (Tr. 22.) Noonan further argues the ALJ failed to explain how one can frequently use her fingers when she has carpel tunnel syndrome. (Pl.'s Br. at 17.) Again, the ALJ specifically explained that the normal strength findings in her upper extremities did not suggest further limitations related to fingering. (Tr. 22.)

Noonan generally argues the ALJ did not properly consider her pain complaints and her mental impairments. (Pl.'s Br. at 18.) Both assertions are inaccurate. The ALJ specifically

considered the fact that Noonan was treating with a pain management provider as recently as November 2016, and found that her "deficits" suggested she should be limited to sedentary work. (Tr. 21.) While Noonan argues that one can be disabled by pain alone (Pl.'s Br. at 18), she has not demonstrated that the ALJ improperly disregarded her pain complaints. Noonan argues the ALJ failed to consider that she had a worsening of mental health symptoms in April 2016 and her medication was discontinued due to severe side effects. (Pl.'s Br. at 19.) The ALJ specifically considered these records (Tr. 21) and cited evidence from July 2016, when Noonan was reporting five out of seven "good days" per week and stating that the "bad days" were from "neuropathic pain," that then made her feel down and worry (Tr. 1202). Thus, the ALJ considered this evidence in determining her RFC. (Tr. 21–22.)

Noonan then generally cites to a plethora of record evidence that she argues the ALJ failed to properly consider. (Pl.'s Br. at 20–21.) But the ALJ is not required to discuss or address every piece of evidence or testimony in the record. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). She need only provide a "logical bridge" between the evidence and her conclusions. *Id.* The ALJ considered both the evidence supporting Noonan's position and the evidence supporting a finding of non-disability. Noonan fails to point to large swaths of evidence the ALJ ignored that would support Noonan's position.

While Noonan disagrees with the ALJ's outcome, the ALJ's reasoning can be followed in her assessment of Noonan's subjective complaints and is supported by the record. The ALJ explained how she accounted for Noonan's deficits in sensation, reflexes, and gait and in her mental health conditions in her RFC. (Tr. 22.) For these reasons, the ALJ's analysis of Noonan's subjective complaints does not require remand.

## CONCLUSION

Noonan argues the ALJ erred by (1) failing to consider whether she met Listing 11.14; (2) creating an evidentiary gap after rejecting the opinions of the state agency physicians; and (3) improperly discounting Noonan's subjective symptoms. I find the ALJ did not err and the decision is supported by substantial evidence. Therefore, the Commissioner's decision is affirmed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 19th day of September, 2019.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge